# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 19-871V
Filed: April 8, 2024

---

H.D.,

               Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

               Respondent.

---

*Robert Joel Krakow*, Law Office of Robert J. Krakow, P.C., New York, NY, for petitioner.
*Voris Edward Johnson*, U.S. Department of Justice, Washington, DC, for respondent.

### **DECISION REGARDING ATTORNEYS' FEES AND COSTS**[1]

      On June 13, 2019, petitioner filed a petition under the National Childhood Vaccine Act, 42 U.S.C. § 300aa-10, *et seq.* (2012), alleging that she suffered injuries including "chronic fatigue syndrome, fibromyalgia, joint pain, rash, pharyngeal swelling, sore throat, amenorrhea, abdominal pain, [Bechet's] disease, headache, tachycardia, seizure disorder and other injuries and conditions," caused or aggravated by either her human papillomavirus ("HPV"), Hepatitis A, or meningococcal B vaccine, administered on June 15, 2016. (ECF No. 1.) Although petitioner pleaded tachycardia, she more specifically cited medical records referencing Postural Orthostatic Tachycardia Syndrome ("POTS") (*Id.* at 11 (quoting Ex. 11, pp. 44-46)), and indicated that she was pursuing further evaluation for POTS (*Id.* at 12).

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

1

Ultimately, petitioner moved to voluntarily dismiss her petition, electing to file a civil action. (ECF Nos. 80-81, 86.) She now moves for an award of attorneys' fees and costs totaling $105,914.73,[2] which respondent opposes. (ECF Nos. 87, 88, 96, 98.)

## I. Procedural History

Although this case was pending for over three years, very little progress was actually made. It was not until April of 2021, that petitioner filed a Statement of Completion. (ECF No. 67.) During that time, petitioner filed exhibits marked 1-60. Respondent filed his Rule 4 Report, recommending against compensation, the following September. (ECF No. 71.) Thereafter, petitioner initially advised that she was consulting an expert, but ultimately, one year following the filing of respondent's report, advised that she would instead dismiss her case in order to pursue a civil action. (ECF Nos. 74, 78.) Judgement entered dismissing this case on December 12, 2022. (ECF No. 84.) Shortly after moving to dismiss her case, she moved to redact the decision and case caption. That motion was granted. (ECF No. 82, 91.) The instant motion practice followed.

## II. Factual History

Petitioner received the subject vaccinations at age 17 during a well child visit on June 15, 2016. (Ex. 1, pp. 114-17; Ex. 46, pp. 68-69.) She had a prior history of Raynaud phenomenon and had experienced a mononucleosis infection about a month prior to vaccination. (Ex. 1, pp. 153-54; Ex. 22, pp. 1-5.) About two weeks post-vaccination, petitioner returned to her primary care provider with complaints of sore throat, fatigue, and low-grade fever. (Ex. 1, pp. 104-06.) The medical records reflect that petitioner's mother had been opposed to petitioner receiving the HPV vaccine and raised concerns that she was experiencing a vaccine reaction (*Id.* at 108; Ex. 9, p. 75); however, the treating physicians were unclear as to whether she was experiencing effects of her mono, another viral infection, or another condition, such as Bechet's disease. (Ex. 1, pp. 104-06; Ex. 9, pp. 67-69, 73-76.) An infectious disease specialist ultimately concluded that petitioner was suffering a prolonged course of mononucleosis. (Ex. 5, pp. 1-4.)

On September 23, 2016, petitioner returned to her primary care provider with complaints of sore joints and an irregular menstrual cycle as well as fatigue and sinus tachycardia. (Ex. 1, pp. 9-12.) By July of 2017, petitioner was still having issues with her throat along with fevers and joint aches. (Ex. 9, pp. 91-94.) By September of 2017, petitioner was experiencing bruising and rashes on her legs. (Ex. 21, pp. 1-10.) She ultimately saw a rheumatologist on October 27, 2017. (Ex. 19, pp. 1-10.) He diagnosed chronic fatigue syndrome. (*Id.*)

---

[2] Initially, petitioner requested $75,651.73 (ECF No. 87), but later filed a motion for supplemental fees, requesting an additional $30,263.00 related to petitioner's reply to respondent's response to the motion for attorneys' fees and costs. (ECF No. 98). Respondent did not file a separate response to the supplemental motion.

On November 13, 2018, petitioner presented to a new provider with complaints of multiple chronic conditions.  (Ex. 17, pp. 34-37.)  (Petitioner had other medical encounters in the interim; however, they are not significant to the issues raised by the parties.)  Petitioner's mother relayed that she was concerned petitioner was suffering POTS.  (*Id.* at 35.)  However, diagnoses at this encounter included only chronic fatigue syndrome and fibromyalgia.  (*Id.* at 34.)

About a month later, petitioner was involved in an auto accident that reportedly occurred as a result of petitioner losing consciousness while driving, presenting a concern for either syncope or seizures.  (Ex. 11, pp. 44-46.)  Petitioner was diagnosed with an unexplained loss of consciousness.  A history of POTS was also noted based on petitioner's mother's report of prior episodes of tachycardia and near-syncope.  (*Id.* at 45-46.)  The history incorrectly states that a prior POTS diagnosis had been rendered.  (*Id.* at 45.)  A subsequent EEG was consistent with complex partial seizures and petitioner was placed on antiseizure medication (Keppra).  (*Id.* at 59-61; Ex. 15, pp. 1-6.)  Petitioner was believed to have a seizure disorder, though it was uncertain whether her seizures were complex partial and/or nonepileptic.  (Ex. 38, pp. 22-27.)

During the summer of 2019, petitioner was evaluated by a cardiologist for POTS. (Ex. 50, pp. 48-91.)  She filed her petition about two weeks prior to her first evaluation by the cardiologist.  A subsequent tilt table test did not meet the criteria for POTS (though the criteria was "barely not met").  (*Id.* at 53.)  However, her subsequent records continued to reflect a POTS diagnosis.  (Ex. 37, pp. 41-43.)

Beginning in November of 2019, petitioner began experiencing hypoxemic respiratory failure that was attributed to Vaping Associated Lung Injury.  Petitioner had reported that she began vaping in 2018.  (Ex. 40, pp. 122-29.)  She was also noted to be experiencing pulmonary edema due to tachycardia.  (*Id.*)  She returned to her cardiologist in December of 2019 for further evaluation of possible POTS.  (Ex. 50, pp. 50-57.)  The cardiologist diagnosed POTS, orthostatic hypotension, syncope and collapse, and inappropriate sinus tachycardia.  (*Id.* at 54-55.)

In January of 2020, petitioner sought an evaluation by James Neuenschwander, M.D.  (Ex. 46, pp. 32-33.)  Based on her history, he diagnosed autoimmune encephalitis, POTS, and migraines, which were attributed to the combined effects of petitioner's HPV vaccination and mononucleosis.  (*Id.*)

### III. Legal Standard

Petitioners who are denied compensation for their claims brought under the Vaccine Act may still be awarded attorneys' fees and costs "if the special master or court determines that the petition was brought in good faith and there was reasonable basis for the claim for which the petition was brought."  42 U.S.C. § 300aa-15(e)(1); *Cloer v. Sec'y of Health & Human Servs.*, 675 F.3d 1358, 1360-61 (Fed. Cir. 2012), *aff'd sub nom. Sebelius v. Cloer*, 569 U.S. 369 (2013).  But even when a claim was brought

in good faith and has a reasonable basis, a special master may still deny attorneys' fees.  *See* 42 U.S.C. § 300aa-15(e)(1); *Cloer*, 675 F.3d at 1362.

"Good faith" and "reasonable basis" are two distinct requirements under the Vaccine Act.  *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017).  Good faith is a subjective inquiry while reasonable basis is an objective inquiry that does not factor subjective views into consideration.  *See James-Cornelius ex rel. E.J. v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1379 (Fed. Cir. 2021).  In this case, petitioner's good faith is not challenged, leaving only the question of whether there was a reasonable basis for the filing of the petition.

The evidentiary standard for establishing a reasonable basis as a prerequisite to an award of attorneys' fees and costs is lower than the evidentiary standard for being awarded compensation under the Vaccine Act.  To establish a reasonable basis for attorneys' fees, the petitioner need not prove a likelihood of success.  *See Woods v. Sec'y of Health & Human Servs.*, No. 10-377V, 2012 WL 4010485, at *6-7 (Fed. Cl. Spec. Mstr. Aug. 23, 2012).  Instead, the special master considers the totality of the circumstances and evaluates objective evidence that, while amounting to less than a preponderance of evidence, constitutes "more than a mere scintilla" of evidence.  *Cottingham ex rel. K.C. v. Sec'y of Health & Human Servs.*, 971 F.3d 1337, 1344, 1346 (Fed. Cir. 2020); *see also Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 287 (2018).

Determining what constitutes "more than a mere scintilla" of evidence has been acknowledged to be a "daunting task."  *Cottingham v. Sec'y of Health & Human Servs.*, 154 Fed Cl. 790, 795 (2021).  The required showing has been characterized as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation."  *Id*. (quoting *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 765 (4th Cir. 2021)).  "More than a mere scintilla" of objective evidence supporting causation can derive from medical records that provide "only circumstantial evidence of causation."  *James-Cornelius*, 984 F.3d at 1379-80.

For example, in *James-Cornelius*, the Federal Circuit found significance in 1) petitioner's medical records containing a doctor's note questioning whether a vaccine adverse event should be reported, 2) the medical course suggesting a challenge-rechallenge event of petitioner's symptoms becoming worse after additional injections of the vaccine, 3) medical articles hypothesizing that the vaccine can cause the symptoms at issue, and 4) petitioner having suffered some of the same symptoms that were listed in the vaccine's package insert as potential adverse reactions of the vaccine.  *James-Cornelius*, 984 F.3d at 1379-80; *see also Cottingham*, 971 F.3d at 1346 (finding that petitioner's medical records showed at minimum circumstantial evidence of causation where petitioner's medical records showed that petitioner received the Gardasil vaccine and subsequently experienced symptoms that were identified in the Gardasil package insert as potential adverse reactions of the vaccine).  Nothing in *James Cornelius* suggests the full extent of what may constitute circumstantial evidence, but the four

examples of circumstantial evidence in *James-Cornelius* provide some guidance regarding the types of circumstantial evidence that may be considered in determining whether a reasonable basis was established.  Conversely, the Federal Circuit also stressed in *James-Cornelius* that an award of attorneys' fees and costs is within the special master's discretion and remanded the case for further proceedings.  984 F.3d at 1381.  Accordingly, it is also not the case that the presence of these specific elements of circumstantial evidence necessarily compel a finding that reasonable basis exists.

As the parties have referenced in their briefing, special masters have begun cautioning would-be petitioners that allegations of HPV vaccine-caused POTS are now well known in this Program and have been uniformly unsuccessful, suggesting that moving forward petitioners are not assured of having a reasonable basis for the filing of such a petition.  *E.g.*, *E.S. v. Sec'y of Health & Human Servs.*, No. 17-480V, 2021 WL 5816006, at *5 (Fed. Cl. Spec. Mstr. Nov. 10, 2021) (stating that "counsel are forewarned to take care in litigating HPV cases" and that fees might be denied for future cases that "trod the same ground but without any new and far more reliable scientific or medical evidence to support the claim").  However, it is also the case these prior cases that have failed to preponderantly establish such claims have generally presented sufficient evidence to overcome the much lower threshold for entitlement to attorneys' fees and costs.  *See id.*; *Hughes v. Sec'y of Health & Human Servs.*, No. 16-930V, 2021 WL 6621169 (Fed. Cl. Spec. Mstr. Dec. 29, 2021); *Balasco v. Sec'y of Health & Human Servs.*, No. 17-215V, 2020 WL 2461911 (Fed Cl. Spec. Mstr. Apr. 16, 2020); *McElerney v. Sec'y of Health & Human Servs.*, No. 16-1540V, 2020 WL 7366343 (Fed. Cl. Spec. Mstr. Nov. 2, 2020); *Combs v. Sec'y of Health & Human Servs.*, No. 14-878V, 2018 WL 2772218 (Fed. Cl. Spec. Mstr. Apr. 23, 2018); *Johnson v. Sec'y of Health & Human Servs.*, No. 14-254V, 2018 WL 3991262 (Fed. Cl. July 3, 2018); *L.A.M. v. Sec'y of Health & Human Servs.*, No. 11-852V, 2017 WL 767710 (Fed. Cl. Spec. Mstr. Feb. 28, 2017); *Turkupolis v. Sec'y of Health & Human Servs.*, No. 10-351V, 2015 WL 393343 (Fed. Cl. Spec. Mstr. Jan. 9, 2015).

### IV.    Party Contentions

Petitioner argues that there is objective evidence supporting the feasibility of her claim sufficient to establish the reasonable basis for the filing of her petition.  (ECF No. 87, pp. 11-12.)  She asserts that the injury she has presented is a "chronic inflammatory condition secondary to immune activation by HPV-vaccination with an autoimmune etiology manifesting as headaches, POTS, chronic fatigue, autoimmune encephalitis, and related symptoms."[3]  (*Id.* at 24.)  Regarding *Althen* prong one, she cites a study by

---

[3] Accompanying this statement, petitioner cites the undersigned's dismissal decision in *Balasco v. Secretary of Health & Human Services*, No. 17-215V, 2020 WL 1240917, at *15 (Fed. Cl. Spec. Mstr. Feb. 14, 2020).  However, it is not clear how this decision supports petitioner's discussion, given that the *Balasco* petitioner was ultimately determined to have suffered fibromyalgia and a migraine disorder unrelated to either her vaccination or her alleged autonomic dsyfunction.  *Balasco* specifically rejected the idea that the HPV vaccine has been shown to be responsible for a broader "syndrome" of autoimmune dysautonomia.

Mehlsen et al. as support for the proposition that POTS can represent an autoimmune reaction to the HPV vaccine.  (*Id.* at 24-26 (quoting Jesper Mehlsen et al., *Autoimmunity in Patients Reporting Long-Term Complications After Exposure to Human Papilloma Virus Vaccination*, 133 J. AUTOIMMUNITY 1 (2022) (Ex. 63, Tab 6)).)  Regarding *Althen* prongs two and three, she notes that one of her physicians, Dr. Neuenschwander, attributed onset of her symptoms to her HPV vaccine.  (*Id.* at 26 (citing Ex. 46, pp. 9-10, 31-32).)

In response, respondent argues that while petitioner alleged a plethora of conditions she attributes to her vaccination, she has not actually established that she suffered any of the conditions at issue.  (ECF No. 88, pp. 13-14.)  In particular, respondent stresses that POTS was raised for the first time by petitioner's mother and her tilt table test was "essentially normal."  (*Id.* at 14-15 (citing Ex. 17, pp. 34-37; Ex. 50, pp. 78-91).)  Further, she has not provided sufficient objective evidence regarding causation-in-fact to establish that her claim was feasible.  (*Id.* at 15.)

Respondent disputes that Dr. Neuenschwander's causal opinion regarding autoimmune encephalitis and POTS – rendered well after this case was initially filed – can support a reasonable basis for the filing of the petition.  (ECF No. 88, pp. 15-16.)  Respondent quotes language from a prior decision indicating that "where the medical records do not provide the required substantiation of the claim, a petitioner who has not, prior to the filing of a petition for compensation under the Program, obtained a medical opinion that a vaccine caused injury, and who is subsequently unable to obtain such an opinion, cannot be said to have had a reasonable basis for the claim at the time the petition was filed."  (*Id.* at 16-17 (quoting *Everett v. Sec'y of Health & Human Servs.*, No. 91-1115V, 1992 WL 35863, at *2 (Fed. Cl. Spec. Mstr. Feb. 7, 1992).)  For the same reason, respondent argues that the Mehlsen article included with petitioner's motion for attorneys' fees cannot support a reasonable basis for the initial filing of this claim, because the petition was filed in 2019 and the article was not published until 2022.  (*Id.* at 17.)

Respondent further argues that petitioner has not provided any objective evidence that her alleged injuries arose within a timeframe from which vaccine causation can be inferred.  And, in any event, a temporal relationship alone would be inadequate.  (ECF No. 88, p. 17.)  He argues that the opinion of any one treating physician (*i.e.*, Dr. Neunschwander) must be balanced against the record as a whole.  (*Id.* at 15-16.)

In reply, petitioner challenges respondent's reliance on the *Everett* decision.  (ECF No. 96, pp. 9-10.)  Petitioner notes that the *Everett* special master explicitly contemplated that petitioners would supplement their petition filings in the course of the case in order to meet the statutory requirements.  (*Id.* at 10.)  Thus, petitioner rejects respondent's contention that Dr. Neunschwander's opinion is too belated to be considered with respect to reasonable basis.  (*Id.* at 16.)  Petitioner further contends that Dr. Neunschwander's clinical judgment must be accepted as "some" evidence even

6

if it is contrary to other record evidence.  (*Id.* at 16-17.)  Petitioner also stresses that her own affidavit must be accepted as objective evidence regarding the existence of her symptoms.  (*Id.* at 14 (citing *James-Cornelius*, 984 F.3d at 1380).)  In response to respondent's challenge to the Mehlsen article, petitioner filed further medical literature purporting to causally link the HPV vaccine to both chronic fatigue syndrome and POTS.  (*Id.* at 29-32; ECF No. 95.)

### V.     Reasonable Basis Determination

Respondent places particular emphasis on the "plethora" of conditions petitioner contends she suffered, seeming to suggest petitioner's overbreadth in her allegations should counsel skepticism of the basis for her petition.  However, it is not necessary for petitioner to substantiate the entirety of her allegations in order to have had a reasonable basis for the filing of her petition.  I find that petitioner's diagnosed POTS and chronic fatigue syndrome are sufficient to support a reasonable basis for the filing of this petition.

At the time petitioner was vaccinated, she was still experiencing fatigue attributable to her prior mononucleosis infection.  (Ex. 1, p. 114.)  Subsequently, she was diagnosed with chronic fatigue syndrome over a year later, on October 27, 2017, based on a history of fatigue that began in the summer of 2016, subsequent to her mononucleosis infection, though the chronic fatigue syndrome was not itself specifically attributed to the mononucleosis.  (Ex. 19, pp. 1-10.)  It would be impossible to pinpoint when fatigue attributable to petitioner's mononucleosis infection would have given way to fatigue attributable to the later diagnosed chronic fatigue syndrome.  But in any event, petitioner does not necessarily dispute that the ongoing mononucleosis infection at the time of vaccination may also have been a contributing factor to her alleged condition.  (ECF No. 1, p. 11.)  Petitioner's medical records also confirm as of September 22, 2016, that, by that time, petitioner's complaints included tachycardia.  (Ex. 1, p. 13.)  She was not evaluated by a cardiologist until June of 2019, after this petition was filed, but she was eventually diagnosed as suffering POTS, based in part on her prior history of tachycardia.  (Ex. 50, pp. 54-55.)  Respondent's assertion that petitioner's tilt table test was "essentially normal" overstates the degree to which the record supports his view.  In fact, the test was explicitly interpreted as "abnormal."  (*Id.* at 76.)  Although petitioner "barely" did not meet the specific criteria for POTS, increased heartrate and syncope were observed.  (*Id.* at 76-77.)  Petitioner's cardiologist subsequently diagnosed POTS with full knowledge of the tilt table results.  (*Id.* at 54-55.)  *Accord C.F. v. Sec'y of Health & Human Servs.*, No.15-731V, 2023 WL 2198809, at *27 (Fed. Cl. Spec. Mstr. Jan. 20, 2023) (finding in light of other available evidence that a tilt table test falling 2 bmp short of the POTS diagnostic criterion was not in itself dispositive of diagnosis).

Petitioner has also filed several articles and studies specifically positing both chronic fatigue syndrome and POTS as adverse events following vaccination.  (ECF No. 95.)  With respect to timing, many of the studies include seemingly overbroad assessments of the appropriate timing.  For example, petitioner specifically urges

7

reference to Ozawa et al. with respect to timing.  (ECF No. 96, p. 30 (citing Kazuki Ozawa et al., *Suspected Adverse Effects After Human Papillomavirus Vaccination: A Temporal Relationship Between Vaccine Administration and the Appearance of Symptoms in Japan*, 40 DRUG SAFETY 1219 (2017) (Ex. 68).)  That study reviewed cases with latencies of up to 43 months.  (Ozawa et al., *supra*, at Ex. 68, p. 9; *see also Balasco*, 2020 WL 1240917, at *31, 36.)  However, the more recent Mehlsen study initially cited by petitioner observed that a significant majority of cases (91.7%) had symptom onset within six months of vaccination.  (Mehlsen et al., *supra*, at Ex. 63, Tab 6, p. 3.)  This, at a minimum, aligns with petitioner's first documented episode of tachycardia.  While much of the body of literature petitioner cites has obviously been found deficient in prior entitlement decisions, as referenced above, it is sufficient when combined with petitioner's medical records to show that more than a mere scintilla of evidence of causation supported petitioner's allegation at the time she filed her petition. *Accord Boss v. Sec'y of Health & Human Servs.*, No. 19-1881V, 2023 WL 6366583 (Fed. Cl. Spec. Mstr. July 21, 2023); *Brunker v. Sec'y of Health & Human Servs.*, No. 18-683V, 2023 WL 21255 (Fed. Cl. Spec. Mstr. Jan. 3, 2023); *Merino v. Sec'y of Health & Human Servs.*, No. 19-1723V, 2022 WL 16579475 (Fed. Cl. Spec. Mstr. Sept. 20, 2022).

   I agree with petitioner that the date on which supporting evidence was created (namely the cardiologist's ultimate diagnosis of POTS and the Mehlsen article) is not dispositive of whether petitioner can rely on that evidence as supporting a reasonable basis.  Petitioner's counsel obviously runs a very real risk of non-payment of fees if appropriate investigation is not completed prior to petition filing and a fundamental aspect of the claim ultimately cannot be substantiated*.  E.g., Cortez v. Sec'y of Health & Human Servs.*, No. 09-176V, 2014 WL 1604002, at *8-9 (Fed. Cl. Spec. Mstr. Mar. 26, 2014); *see also Everett*, 1992 WL 35863.[4]  However, that is far different from suggesting special masters are obligated to turn a blind eye to later created evidence when assessing reasonable basis.  Indeed, respondent specifically, and otherwise unremarkably, argues that an expert report could have supported a reasonable basis.  (ECF No. 88, pp. 16-17.)  Such reports are routinely created after a petition has already been filed.  Medical evaluations occurring subsequent to the filing of a petition might be viewed in a different light if they do not appear to reflect a genuine treatment relationship, but that would not deprive them of all evidentiary value.

---

[4] As a decision by a special master, the *Everett* decision cited by respondent is not binding authority.  Where it has been cited by other special masters, it is for the same basic proposition as discussed in *Cortez*, 2014 WL 1604002.  Namely, that attorneys run a financial *risk* when filing a claim without complete documentation.  *E.g., Sheller v. Sec'y of Health & Human Servs.*, No. 18-696V, 2022 WL 4075946, at *5 (Fed. Cl. Spec. Mstr. Aug. 15, 2022).  To the extent respondent cites *Everett* for the more specific proposition that petitioner's initial filing must include an express medical opinion, whether by a treating physician or expert, sufficient to support reasonable basis, such a holding could no longer be considered good law in light of the Federal Circuit's subsequent decisions in *Cottingham* and *James-Cornelius*.  *See James-Cornelius*, 984 F.3d at 1379 (citing *Cottingham*, 971 F.3d at 1346 for the proposition that "absence of an express medical opinion on causation is not necessarily dispositive of whether a claim has a reasonable basis").

Although the parties discussed Dr. Neuenschwander's medical record extensively in their briefs, I do not find it helpful in resolving this motion.  Although I do agree with petitioner that the date of Dr. Neuenshwander's encounter with petitioner is not dispositive, I would not find that Dr. Neuenshwander's opinion supports a reasonable basis for this petition without further probing.  Dr. Neuenshwander is known to this program as an expert witness and his credibility has been called into question for rendering diagnoses beyond his expertise and for harboring broadly anti-vaccine views. *Ruzicka v. Sec'y of Health & Human Servs.*, No. 17-109V, 2023 WL 8352496, at *17 & n.9 (Fed. Cl. Spec. Mstr. Nov. 13, 2023).  It has also been noted that he has been subject to disciplinary action related to providing improper medical advice.  *Jennings v. Sec'y of Health & Human Servs.*, No. 16-779V, 2020 WL 9258304, at *10 n.16 (Fed. Cl. Spec. Mstr. July 8, 2020).  In this case, although petitioner argues Dr. Neuenshwander had access to petitioner's prior medical records, the credibility of his diagnoses and causal assessment are not established on the face of his medical record, especially because he purports to diagnose autoimmune encephalitis, despite not being either an immunologist or neurologist.

## VI.     Amount of the Award

The Federal Circuit has approved a lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act.  *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1347 (Fed. Cir. 2008).  This is a two-step process.  *Id.* at 1347-48.  First, a court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'"  *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)).  Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings.  *Id.* at 1348.  Special Masters have "wide latitude in determining the reasonableness of both attorneys' fees and costs." *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 22 Cl. Ct. 750, 753 (1991).  Moreover, special masters are entitled to rely on their own experience and understanding of the issues raised. *Wasson ex rel. Wasson v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 482, 485 (1991), *aff'd per curiam in relevant part*, 988 F.2d 131 (Fed. Cir. 1993).

Based on my review of the billing records, counsel's requested hourly rates are reasonable.  *Flowes v. Sec'y of Health & Human Servs.*, No. 20-961V, 2024 WL 963729, at *2 (Fed. Cl. Spec. Mstr. Jan. 31, 2024).  However, several reductions to the hours billed are necessary.  A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees.  *Broekelschen v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 729 (2011). However, I have identified two specific reductions of non-compensable hours.  I will first make those reductions before then making several further reductions as a percentage of the resulting reduced amount.

First, Mr. Krakow billed 9 hours at $464 per hour for which he (presumably inadvertently) did not document any work having been performed.  (Ex. 63, Tab 2, pp.

4-5 (entries dated 1/5/2019 and 4/10/2019).)  These hours are not compensable, resulting in a reduction of $4,176.00, from $74,021.50 to $69,845.50.  Second, there are also quite a few entries wherein Mr. Krakow has billed for consultation regarding civil actions, first with respect to a possible malpractice action in Michigan and later with respect to a class action relative to the HPV vaccine.  Without doubting that these conversations are appropriate as a general matter or doubting Mr. Krakow's involvement, legal counsel provided for purposes of assessing a separate civil action is not "incurred in any proceeding on such petition."  42 U.S.C. § 300aa-15(e).  Accordingly, I do not find this time compensable.[5]  This results in a reduction of $1,639.20,[6] further reducing attorneys' fees from $69,845.50 to $68,206.30.

      While Mr. Krakow was generally conscientious regarding the need to distinguish between billing for attorney and paralegal work, he did include some entries where he billed at his attorney rate despite having identified the work as paralegal.  (*E.g.*, Ex. 63, Tab 2, pp. 17, 20 (entries dated 7/21/20 and 11/12/20).)  Additionally, he appears to have billed at his attorney rate for all communications with petitioner and the court even when the subject of the communication was strictly logistical.  (*E.g.*, Ex. 63, Tab 2, p. 2 (billing at attorney rate for e-mail "regarding return of documents, and signed authorizations"), p. 13 (billing attorney rate to schedule a status confernece), p. 22 (billing attorney rate for e-mail exchanges with petitioner regarding the status of mailings sent between attorney and client); p. 23 (billing attorney rate for e-mail dedicated to "logistics"), p. 29 (billing at attorney rate for e-mail to set up a separate telephone conference), p. 32 (billing attorney rate for e-mail pertaining to "status of judgment").  Given this blanket treatment, some additional entries regarding communications with petitioner are impermissibly vague as to the nature of the communication.  (*E.g.*, Ex. 63,

---

[5] Recognizing that consultations can have a dual purpose or character, I have not reduced fees in this case for billing entries that clearly reflect such a dual purpose based on my review.  For example, I did not reduce counsel's hours for a January 22, 2020 billing entry that included "advice to client how to choose" between this action and a separate civil action.  (Ex. 63, Tab 2, p. 12.)  However, to the extent any of the billing entries are ambiguous with respect to such dual character, petitioner does bear the burden of proof with respect to demonstrating the reasonableness of the hours expended, including the burden of adequately descriptive billing records.  *E.g., Mostovoy v. Sec'y of Health & Human Servs.*, No. 02-10V, 2016 WL 720969, at *6 (Fed. Cl. Spec. Mstr. Feb. 4, 2016) (explaining that "[i]t is well established that an application for fees and costs must sufficiently detail and explain the time billed so that a special master may determine, from the application and the case file, whether the amount requested is reasonable").

[6] Specifically, I have identified the following entries as non-compensable:

- During 2018, at the attorney rate of $450 per hour: .1 hours on 12/7/2018; .3 hours on 12/11/2018; .15 hours on 12/31/2018.  This totals $247.50.
- During 2020, at the attorney rate of $484 per hour:  .1 hours on 1/14/2020; .1 hours on 8/19/2020; .6 hours on 9/17/2020; .15 hours on 9/18/2020; .55 hours on 9/21/2020.  This totals $726.00.
- During 2021, at the attorney rate of $509 per hour:  .35 hours on 4/8/2021; .3 hours on 4/13/2021; .1 hours on 12/6/2021; .3 hours on 12/23/2021.  This totals $534.45.
- During 2022, at the attorney rate of $525 per hour: .25 hours on 8/5/2022.  This totals $131.25

Tab 2, p. 27 (12/20/2021 entry billing attorney rate for e-mail "re status").)  I find that a 10% reduction in overall attorneys' fees is appropriate to correct these deficiencies.

There is also an excessive amount of client communication for a case that, while it did remain pending for an extended period, ultimately never moved beyond the records collection phase.  In particular, petitioner was collecting medical records for very nearly two years after initially filing this petition.  She did not file a Statement of Completion until April 10, 2021.  Yet, during that period, significant portions of counsel's billing records are devoted to fielding e-mails from petitioner (in actuality, petitioner's mother).  Even accounting for the fact that petitioner was still undergoing medical treatment for her alleged condition, the extent of the client contact is excessive at a phase in the litigation where petitioner was simply collecting medical records and respondent had not yet even filed his responsive report.  Thus, I find a 5% reduction is appropriate.

Finally, it must be noted that these attorneys' fees and costs have been requested in a case that was terminated prematurely, and without substantive adjudication, so that petitioner could pursue a civil action.  While this factor does not in itself affect whether the petition was filed in good faith and with a reasonable basis, several special masters have found that this circumstance warrants consideration with respect to the amount of attorneys' fees that should be paid by the Program.  For example, in *Atjian v. Secretary of Health & Human Services*, the Chief Special Master exercised his discretion to reduce the requested attorneys' fees by 25% in light of the fact that petitioner's termination of the case resulted in "[n]othing of substance [being] accomplished in the case, beyond meeting the Act's basic requirements."  No. 21-1413V, 2022 WL 17587757, at *12-13 (Fed. Cl. Spec. Mstr. Oct. 18, 2022).  He explained that "in the reasonable exercise of my discretion under the circumstances, the overall *magnitude* of the award should be more modest than what has been requested." *Id.* at *13.  Notably, the amount the Chief Special Master criticized as insufficiently modest was approximately one-fifth the amount requested in this petitioner's initial motion.  Special Master Sanders similarly reduced fees under the same circumstances by 15%, explaining that "[w]hile I recognize that attorney work is necessary to meet the minimum requirements of the statue by requesting, reviewing, and filing medical records, the amount of such attorney work should be limited when the intent is to withdraw the petition and pursue alternative litigation." *Wingerter ex. rel. H.W. v. Sec'y of Health & Human Servs*., No. 20-1408V, 2022 WL 1843522, at *14-15 (Fed. Cl. Spec. Mstr. May 17, 2022); *see also Nyboer v. Sec'y of Health & Human Servs*., No. 21-1010V, 2022 WL 601753, at *10 (Fed. Cl. Spec. Mstr. Jan. 27, 2022).

These prior cases are distinguishable from this case insofar as the petitioner's intent to pursue a civil action was clear from the outset of the filing of the petition.  However, in my own prior decision in *Thomas ex rel. Z.T. v. Secretary of Health & Human Services*, I directly addressed the circumstance wherein petitioner did not definitively decide to exit the program until later in proceedings.  No. 20-886V, 2021 WL

11

2389837, at *11-12 (Fed. Cl. Spec. Mstr. May 17, 2021).  In that case, I acknowledged that "substantive work during the pendency of this case was warranted and reasonable because petitioner's abandonment of his claim within the Program was not inevitable. Nonetheless, I remain concerned that the hours billed in this case remain high in comparison to what was actually accomplished."  *Id.* at *11.  Accordingly, in light of that and other issues I reduced fees by 20%.  *Id.* at *12.  Again, however, the amount initially requested was only about one-fifth the amount requested in this case.

      Although this case was not initially filed with the intention of pursuing a civil action, the billing records confirm that petitioner first discussed pursuit of a civil action in January of 2020 (Ex. 63, Tab 2, p. 11), about a month prior to the issuance of the 240-day notice.  Despite this, substantial subsequent billing occurred without any forward progress in the case.  However, despite ongoing discussions with counsel, petitioner did not ultimately make her final decision to withdraw her petition until August 24, 2022.  (*Id.* at 29.)  Notably, petitioner's counsel researched the possibility of requesting a stay at the time a civil action was first discussed, but no stay was ever requested.  (*Id.* at 12.) Petitioner cannot be faulted for being cautious regarding that decision; however, awards of attorneys' fees and costs in this Program are subject to a reasonableness standard and no reasonable explanation for the over two-year period of uncertainty and seemingly excess billing has been provided.  Even accounting for the fact that petitioner was still seeking medical evaluations after filing her petition, she had already been diagnosed by her cardiologist with POTS in December of 2019 (as anticipated by her petition) and had consulted Dr. Neuenschwander in January of 2020, who was the first physician to offer an opinion purporting to support vaccine causation.  The billing records also reflect that counsel had explicitly discussed the relevant prior Program caselaw with petitioner by no later than December of 2021.  (*Id.* at 27.)  Attorneys are not entitled to compensation for performing work that is not necessary.  *Riggins v. Sec'y of Health & Human Servs.*, No. 99-382V, 2009 WL 3319818, at *4 (Fed. Cl. Spec. Mstr. June 15, 2009) (citing *Hensley v. Echkerhart*, 461 U.S. 424, 434 (1983)), *aff'd*, 406 Fed. App'x 479 (2011).  Additionally, petitioners are not given a "blank check to incur expenses."  *Id.* (quoting *Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994)).

      Even in other similarly situated cases that did not set out to exit the program at 240 days, attorneys' fees have been much more modest.  For example, petitioner's counsel in *McElerney v. Secretary of Health & Human Services*, requested a total of only $57,311.61, representing $19,910.50 in fees and $37,401.11 in costs.  No. 16-1540V, 2020 WL 7366343 (Fed. Cl. Spec. Mstr. Nov. 2, 2020).  Similar to this case, *McElerney* was an HPV vaccine case pending for over three years before the petitioner ultimately determined that she would voluntarily dismiss her case and pursue a civil action.  *McElerney v. Sec'y of Health & Human Servs.*, No. 16-1540V, 2020 WL 4938429 (Fed. Cl. Spec. Mstr. July 28, 2020).  Unlike this case, the petitioner prosecuted the case into the expert stage.  Even with expert costs, the attorneys' fees

and costs requested in *McElerney* are about half the total request of $105,914.73 in this case.

Special masters may rely on their experience with the Vaccine Program to determine the reasonable number of hours expended. *Wasson ex rel. Wasson v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 482, 483 (1991), *rev'd on other grounds and aff'd in relevant part per curiam*, 988 F.2d 131 (Fed. Cir. 1993). It is "well within the special master's discretion to reduce the hours to a number that, in his experience and judgment, [is] reasonable for the work done." *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993); *see also Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 403, 406 (1997) (noting that "[t]he special master reduced the number of hours based on a comparison of the length and complexity of this case with other Vaccine Program precedent. This was appropriate."). Given the circumstances in this case and the total amount sought, I find in my discretion that a further 20% reduction is appropriate.

Petitioner also filed a supplemental motion requesting $30,263.00 in attorneys' fees for 56.5 hours of work dedicated to the preparation of petitioner's reply brief responding to respondent's reasonable basis arguments. This is patently excessive. *E.g.*, *Brandt v. Sec'y of Health & Human Servs.*, No. 21-0494V, 2024 WL 1050102, at *2 (Fed. Cl. Spec. Mstr. Feb. 9, 2024) (collecting cases identifying the number of hours billed for briefing, albeit in the context of damages). The number of hours billed for just petitioner's reply far exceeds what has been found reasonable for more substantive pre- and post-hearing briefs. *Doe v. Sec'y of Health & Human Servs.*, No. XX-XXXV, 2010 WL 529425, at *8 (Fed. Cl. Spec. Mstr. Jan. 29, 2010) (reducing hours for a post-hearing brief to 27.7); *Caves v. Sec'y of Health & Human Servs.*, No.07-443V, 2012 WL 6951286, at * 8 (Fed. Cl. Spec. Mstr. Dec. 20, 2012) (stating that "[a] reasonable amount of time for experienced attorneys to draft the fresh portion of the post-hearing brief is 15 hours").

There are also several specific factors that further warrant a reduction in hours for this particular reply brief. First, although petitioner stated in her motion that she was reserving the right to address reasonable basis more thoroughly in reply, the essential elements of her argument were already present in her initial motion. Petitioner billed 13.5 hours drafting the initial fee motion, 5.5 hours of which was specifically dedicated to substantiating reasonable basis. (Ex. 63, Tab 2, pp. 36-37.) While some germane arguments were made, the reply brief as a whole did not play any outsized role in resolving this motion. Second, the billing records reflect substantial hours dedicated to review of caselaw and medical records that should already have been familiar to counsel. Third, a significant portion of petitioner's legal arguments in reply simply repeats aspects of the applicable legal standard that were not meaningfully challenged by respondent. For example, petitioner argued at length that a special master can consider the "totality of the circumstances" (ECF No. 96, pp. 4-10), despite the fact that respondent had explicitly agreed that the special master may consider the totality of the

13

circumstances (ECF No. 88, p. 13). Additionally, introducing a second attorney for purposes of preparing a reply brief, despite that attorney not having worked on either the initial motion or the merits phase of the case, likely led to unreasonable inefficiency.

In light of all of this, I will award petitioner only ten hours of Mr. Krakow's attorney time and two hours of paralegal time for the preparation and filing of the reply brief. This reduces petitioner's supplemental request from $30,263.00 to $5,902.00.

I have reviewed the costs requested and find that they are reasonable and sufficiently documented. Accordingly, full costs are awarded in the amount of $1,630.23.

In sum, after eliminating specific objectionable billing entries from petitioner's initial billing records, petitioner's attorneys' remaining requested fees totaled $68,206.30. From that amount, I determined that appropriate reductions of 10% (for paralegal work), 5% (for excessive client communication), and 20% (for excessive billing prior to pursuit of a civil action), are appropriate. Thus, a total reduction of 35% is made. This results in attorneys' fees of $44,334.10. With the allowed costs and hours for petitioner's reply brief, the total award of attorneys' fees and costs is $45,964.33, reduced from $105,914.73.

### VII.   Conclusion

For the reasons set forth above, petitioner established a reasonable basis for the initial filing of her petition as required for an award for attorneys' fees and costs. Accordingly, an award for attorney's fees and costs is GRANTED. However, attorneys' fees and costs are awarded in the reduced amount of $45,964.33 for all the reasons discussed above.

**Accordingly, I award a total of $45,964.33 as a lump sum in the form of a check payable to petitioner and his counsel, Robert Krakow, Esq.**

The clerk of the court shall enter judgment in accordance herewith.[7]

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u><br>
Daniel T. Horner<br>
Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.